Joseph P. LaSala, Esq.
William F. O'Connor, Jr., Esq.
**McELROY DEUTSCH MULVANEY & CARPENTER LLP**
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962
Telephone # (973) 993-8100
Facsimile # (973) 425-0161

-and-

Stephen Wagner, Esq.
Sari Kolatch, Esq.
Jed Lewin, Esq.
**COHEN TAUBER SPIEVACK AND WAGNER LLP**
420 Lexington Ave. Suite 2400
New York, NY 10170
Telephone: (212) 586-5800
Facsimile: (212) 586-5095

Attorneys for Plaintiff, IDT Corporation

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IDT CORPORATION, | CIVIL ACTION NO. |
| Plaintiff, | COMPLAINT |
| vs. | |
| TOURO COLLEGE, TOURO UNIVERSITY, TOURO UNIVERSITY INTERNATIONAL and SUMMIT PARTNERS, | |
| Defendants. | |

Plaintiff IDT Corporation ("IDT"), by and through its attorneys, for its Complaint, alleges as follows:

1033583_1

## THE PARTIES

1. IDT is a Delaware public corporation with its principal place of business at 520 Broad Street, Newark, New Jersey, 07102. IDT is, *inter alia*, a leading and pioneering telecommunications company.

2. Upon information and belief, Defendant Touro College ("Touro") is a New York not-for-profit corporation, with its principal place of business at 27-33 West 23rd Street, New York, NY 10010.

3. Upon information and belief, Defendant Touro University ("Touro U.") is a California not-for-profit corporation, with its principal place of business at 1310 Johnson Lane, Mare Island, Vallejo, CA 89014.

4. Upon information and belief, Defendant Touro University International ("TUI") is a California corporation with its principal place of business at 5665 Plaza Drive, 3rd Floor, Cypress, CA 90630.

5. Upon information and belief, Defendant Summit Partners ("Summit") is a partnership with its principal place of business at 222 Berkeley Street, 18th Floor, Boston, MA 02116.

## INTRODUCTION

6. This case arises out of a binding agreement between Defendant Touro and IDT regarding Touro's formation of an internet-based university. Stated simply, in exchange for a 20% equity interest in the university, IDT agreed to, and did, provide initial and essential support, including physical, technological, engineering, financial and logistical support, to enable Touro to establish the university.

7. Indeed, in 1998, after IDT provided such support, Touro established an internet-based university, TUI, a division of Touro's subsidiary, Touro U.

8. TUI operated as a division of Touro U. from its inception until on or about October 31, 2007, when Touro, without informing IDT, and notwithstanding its knowledge of IDT's 20% equity position, sold substantially all of TUI's assets to Summit Partners for $190 million. After learning of TUI's sale from a press release, IDT orally demanded from Touro's President that Touro remit to IDT 20% of the proceeds in accordance with the agreement entered into in 1998. Despite due, adequate and repeated demand, Touro has refused, and continues to refuse, to pay to IDT the contractually agreed upon 20% of the proceeds of that sale. Rather than live up to its agreement, Touro falsely informed IDT that it, in fact, does not have, and never had, any equity interest in TUI.

9. As a result of Touro's unlawful acts, IDT brings this action seeking alternative relief. First, IDT seeks damages from all of the Touro entities for breach of contract in the amount of at least $38 million, plus all applicable interest at the highest rate permitted by law. In the alternative, IDT seeks a declaration from this Court that its ownership interest in TUI was not lawfully sold to Summit, and thus IDT retains such interest in the assets Summit purchased.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 as the parties to this action are of diverse citizenships and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11. Venue in this District is proper pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

12. Upon information and belief, Touro was founded by Dr. Bernard Lander ("Dr. Lander") in 1970, and operates undergraduate and graduate schools on several campuses throughout the United States and Israel, and has affiliated programs in Europe.

13. IDT is a public company that has business in the telecommunications area as well as other areas. It was formed by Howard Jonas ("Mr. Jonas") in 1990.

14. In mid- to late 1998, Dr. Lander informed Mr. Jonas of Dr. Lander's interest in creating an on-line, internet-based university, and sought Mr. Jonas' advice. Dr. Lander told Mr. Jonas that although Touro could provide the faculty and establish an appropriate curriculum, it possessed neither the technical capabilities nor the required hardware, software and technology infrastructure required for such an endeavor.

15. Dr. Lander suggested to Mr. Jonas that, given IDT's success in emerging technical fields and markets, IDT would be able to provide the necessary assistance in establishing the on-line university.

16. Mr. Jonas expressed to Dr. Lander his interest in the concept of an on-line university, and offered, on behalf of IDT, in exchange for IDT receiving 20% of the equity in this venture, to have IDT provide the necessary hardware, software, and technical assistance crucial for the formation and initial operation of the on-line university. On behalf of Touro, Dr. Lander accepted Mr. Jonas's offer (the "Agreement").

17. In discussions regarding how IDT's 20% equity would be conveyed, Mr. Jonas told Dr. Lander that despite IDT's 20% equity interest in the on-line venture, IDT would not seek any distributions of profits from the operations of the on-line university, as both Dr. Lander and Mr. Jonas preferred that the funds be reinvested in the venture. Mr. Jonas and Dr. Lander

expressly agreed that IDT would defer any distribution until either an initial public offering, if any, or the sale, of this venture.

18. Thus, in late 1998, in accordance with the agreement reached between Dr. Lander and Mr. Jonas on behalf of Touro and IDT, respectively, Touro established TUI, an internet-based university, registered and accredited in the State of California, and IDT provided essential goods and services, including internet hosting and connectivity, a dedicated T-1 access line, and computer hardware and equipment, without which TUI could not function. Much of this hardware and equipment was purchased by IDT specifically for use by TUI. A complete list of the hardware and equipment IDT initially provided to TUI is attached hereto as Exhibit A and made a part hereof.

19. In accordance with the aforementioned agreement, IDT provided TUI with essential technical personnel, including, but not limited to, IDT's technical expert Golan Ben Oni, to determine TUI's needs and assist in the set up its technology systems and equipment. This included, without limitation, technical services relating to network security, network structure, network architecture, and the evaluation of streaming video platforms.

20. Once established, Touro operated TUI as a division of Touro U.

21. Around this time, at Dr. Lander's invitation, Mr. Jonas joined the boards of trustees of both Touro and Touro U.

22. In or about April, 1999, Touro asked IDT to provide TUI with additional equipment and hardware for an expansion of TUI's operations. In connection with this request for additional assistance, IDT and Touro exchanged drafts of contracts and other documents, none of which were signed, to memorialize the changing business relationship between IDT and Touro.

23. Between April and September 1999, Touro and IDT, through counsel, engaged in negotiations to modify the Agreement and memorialize IDT's role in the formation and establishment of TUI. These contract talks ultimately were abandoned, leaving the original oral Agreement in place.

24. Throughout this time, IDT fulfilled its obligations under the Agreement by providing essential technical assistance and investing management time to enable TUI to operate and become a profitable and marketable venture.

25. Upon information and belief, in or about April 2004, at a meeting of the Touro Board of Trustees (the "Board"), Dr. Lander informed the Board that he intended to sell substantially all of the assets of TUI to Sylvan Learning Center ("Sylvan"), a company specializing in childhood educational tutoring, for approximately $100 million.

26. Mr. Jonas, after making appropriate inquiries of Dr. Lander, informed the Board that he thought TUI's value to be much greater. He also reminded Dr. Lander and the Board of IDT's 20% equity ownership of TUI.

27. Mr. Jonas sought advice as to the value of TUI from an IDT Board member, William Weld, formerly governor of Massachusetts and then a principal of Leeds, Weld & Co. ("Leeds, Weld"), a venture capital fund specializing in the emerging for profit education field. Shortly after hearing from Mr. Jonas, Leeds, Weld valued TUI at $140 million, and attempted to negotiate a purchase of TUI. One of the features of the Leeds, Weld offer was that IDT's claim for its 20% share would be absorbed by Leeds, Weld, and would not come out of the sales proceeds.

28. On about May 20, 2004, IDT's counsel wrote to Touro's counsel regarding Touro's proposed plan to conduct the sale of substantially all of TUI's assets through an auction.

IDT's counsel demanded that Touro inform any potential bidder of IDT's claim to 20% of the proceeds of any sale of TUI, and provided information regarding IDT's interest to Touro's counsel. A copy of the May 20, 2004, email is attached hereto as Exhibit B and made a part hereof.

29. By letter dated June 11, 2004, from Touro's attorneys, responding to an IDT's counsel's May 20, 2004, email, Touro, for the first time, informed Mr. Jonas that Touro contended that IDT did not own any equity interest in TUI and was not entitled to share in any of the proceeds of any TUI sale. A copy of the June 11, 2004, letter is attached hereto as Exhibit C and made a part hereof.

30. The Touro Board inexplicably rejected the Leeds, Weld proposal, despite such proposal being considerably more favorable to Touro ($40 million more in cash and the elimination of Touro's obligation to IDT) than the Sylvan offer. Upon information and belief, the sale to Sylvan was not consummated and TUI continued to operate as a Touro entity.

31. In or about June 2004, Mr. Jonas tendered his resignation from the Touro and Touro U. Boards.

32. On or about October 31, 2007, Touro publicly announced a deal to sell substantially all of the assets of TUI to Summit for approximately $190 million.

33. Pursuant to the Agreement between Touro and IDT, IDT is entitled to 20% of the proceeds of the sale of TUI to Summit.

34. Despite their clear contractual obligation to do so, Touro has refused to pay IDT any portion of the proceeds of the sale of TUI to Summit.

35. Accordingly, IDT is entitled to either of the following: (i) payment from Touro of 20% of the sales proceeds; or (ii) a declaration from this Court that IDT retains its 20% equity position in TUI regardless of Summit's purchase of TUI from Touro.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

36. IDT repeats and realleges the allegations in paragraphs 1 through 35 as if fully set forth herein.

37. The Agreement is a valid, binding, and legally enforceable contract between Touro and IDT.

38. IDT has performed all of its obligations under the Agreement by providing Touro with the agreed-upon initial and necessary support and assistance, including hardware, software, and technical assistance, for the foundation and operation of TUI.

39. On or about October 31, 2007, Touro agreed to sell substantially all of the assets of TUI to Summit, for the reported price of $190 million.

40. Pursuant to the Agreement, IDT, as a 20% equity owner, is entitled to 20% of the amount Touro received or will receive from Summit for the sale of TUI.

41. Despite due, adequate and repeated demand, Touro has refused, and continues to refuse, to pay IDT any portion of the proceeds of the sale of TUI to Summit, despite Touro's clear contractual obligation to do so.

42. Touro's refusal the pay the amount due and owing to IDT constitutes a breach of the Agreement.

43. IDT is entitled to a judgment against Touro in an amount to be determined at trial, but in no event less than $38 million, plus interest at the highest legal rate.

## AS AND FOR A SECOND CAUSE OF ACTION
(Declaratory Judgment Against Summit)

44. IDT repeats and realleges the allegations in paragraphs 1 through 43 as if fully set forth herein.

45. The Agreement is a valid, binding, and legally enforceable contract between Touro and IDT.

46. IDT has performed all of its obligations under the Agreement by providing Touro with the agreed-upon initial and necessary support and assistance, including hardware, software, and technical assistance, for the foundation and operation of TUI.

47. IDT owns a 20% equity interest in TUI.

48. On or about October 31, 2007, Touro agreed to sell TUI to Summit, for approximately $190 million.

49. IDT was not aware of the sale of TUI to Summit, did not sell its 20% equity interest in TUI to Summit, and did not receive 20% of the proceeds of the sale of TUI to Summit.

50. An actual case or controversy exists between IDT and Summit with regard to ownership of the sold entity, TUI.

51. Therefore, pursuant to 28 U.S.C. § 2201, IDT is entitled to a judicial determination and declaration that IDT is and remains a 20% percent shareholder of TUI, regardless of the identity of the remaining 80% shareholder(s). Such a declaration is necessary and appropriate at this time under the circumstances alleged.

52. IDT has no adequate remedy at law.

**WHEREFORE**, IDT respectfully requests that this Court enter judgment in its favor against Defendants Touro College, Touro University, Touro University International, and Summit Partners as follows: (i) on its First Cause of Action, for Breach of Contract in an

1033583_1

amount to be determined at trial, but in no event less than $38 million, together with interest at the highest rate permitted by law; or in the alternative (ii) on its Second Cause of Action, for Declaratory Judgment against Summit declaring that IDT is a 20% shareholder of TUI, for such other and further relief as this Court deems just and proper including attorneys fees and cost.

## JURY DEMAND

Plaintiff demands a trial by jury.

## L.CIV.R. 11.2 CERTIFICATION

Pursuant to the Local Rules of the United States District Court for the District of New Jersey, the undersigned counsel for plaintiff IDT Corporation ("IDT"), certify that none of the matters in controversy here are the subject of any other action pending in any Court, arbitration, or administrative proceeding.

By: /s/ Joseph P. La Sala
Joseph P. LaSala, Esq.
William O'Connor, Jr., Esq.
**McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP**
1300 Mount Kemble Avenue
P.O. Box 2075
Morristown, New Jersey 07962
Telephone # (973) 993-8100
Facsimile # (973) 425-0161

-and-

Stephen Wagner, Esq.
Sari Kolatch, Esq.
Jed Lewin, Esq.
**COHEN TAUBER SPIEVACK AND WAGNER LLP**
420 Lexington Ave. Suite 2400
New York, NY 10170
Telephone: (212) 586-5800
Facsimile: (212) 586-5095

Dated: December 21, 2007

1033583_1

# EXHIBIT A

*Hardware*

| Name | Qty |
|---|---|
| Digital Server Computer 7000 (single Alpha processors) with Raid 5 Digital Storage Works Array | 2 |
| Dell PowerEdge 6300, 400MHz/512K Redundant Power Supplies | 2 |
| Logitec System Mouse w/Driver Disks | 1 |
| Tower Option, Rubber Feet for Dell PowerEdge 4330076300 | 1 |
| Windows Performance 104 Key Keyboard | 1 |
| 512MB RAM, 4 X128MB EDO DIMMs for Dell PowerEdge 6300 | 1 |
| 6 Bay Hard Drive Backplane, 1.6" or 1.0", for Dell PowerEdge 6300 | 1 |
| Dell PowerEdge 6300, 400MHz, 512K, Quad Processors | 1 |
| 14/32X SCSI CD ROM, for Dell PowerEdge 6300 1st CD Option | 1 |
| 1.44MB, 3.5" Floppy Drive, for Dell PowerEdge 6300 | 2 |
| 35/70GB DLT 7000 Tape Backup (using 2940) for Dell PowerEdge 6300 | 1 |
| Raid 5 Hard Drive Config #5, For Dell PowerEdge 6300 | 1 |
| 3 x 4GB LVD SCSI Smart Hard Drives, 7200RPM, for Dell PowerEdge 6300 | 1 |
| Intel Pro 100 Plus Ethernet Network Card | 2 |
| PowerEdge Expandable Raid Controller (PERC), 16MB PCI, 1 Internal/1 External Channel | 2 |
| Dell PowerEdge 6300, 400MHz/512K, Redundant Power Supplies | 1 |
| 512MB RAM, 4 x 128MB EDO DIMMs for Dell PowerEdge | 1 |
| Dell PowerEdge 6300, 400MHz, 512K, Second Processor | 1 |
| 14/32X SCSI CD ROM, For Dell PowerEdge 6300 1st CD Option | 1 |
| 3 X 4GB LVD SCSI Smart Hard Drives, 7200RMP, for Dell PowerEdge 6300 | 1 |
| PowerEdge Expandable RAID Controller (PERC), 16MB PCI, 1 Internal | |
| Dell P6350 Computers(100MHz FSB) GX1/M+ Base w/4MB Integ Video Memory, Integ Audio, Integ 10/100 WuOL Networking, 512K Cache | 8 |
| WIN95 Spacesaver Quiet Key, 104 Key Keyboard | 8 |
| Racks for Servers | 2 |
| Compaq Workstation (Model AP400) Compaq Monitor (Model V90) | 1 |
| MICROSOFT PS2 Intellimouse | 8 |
| 64MB, Non-Ecc, SDRAM, 1 DIMM, 100MHz, GX1, 350= MHz | 8 |
| 14-32X IDE CD ROM | 8 |
| Dell 1000LS Color Monitor, Model #D1028L w/15.9" Viewable Image Size, Shipped with system | 8 |
| 3.5" 1.44MB Floppy Drive | 8 |
| 4.3GB IDE Hard Drive, GX1; M/T, 350+MHz | 8 |
| Windows 95 CD, CD Documentation | 8 |
| Active Expansion Riser for GX1M/T Systems, 3 PCI/2 Shared Wake up on Lan | 8 |
| SelectCare, Initial Year, Next Business Day On-Site Service Contract | |

Sent By: IDT Corporations;    973 4381456;    May-19-04 12:32PM;    Page 2/2

| Item | Qty |
|---|---|
| BSC* | 8 |
| SelectCare, 2 Years Extended, Next Business Day On-Site Service Contract | 8 |
| Panasonic VCR Model PV-S7670 | 1 |
| Cisco Catalyst 5505 Switch | 1 |
| Cisco Router 1605-R | 1 |
| Smart Cell XR Battery Backup | 1 |
| Matrix VPS 5000 Battery Backup | 1 |
| Sony Digital Satellite System | 1 |
| Sony DVD Player Model DVP-S300 | 1 |
| Sony AM/FM Receiver/Amplifier Model STR-DE925 | 1 |
| Energy Speaker 100W Model ES8 | 1 |
| Panasonic Phone System with Control Unit Model KX-TD816, (8 line and 16 phone capable) | 1 |
| Panasonic Display Phones, Model KX-T7230 | 1 |
| Panasonic Phones, Model KX-T7250 | 4 |
| Panasonic Phones, Model KX-T7220 | 3 |
| Tektronix Color Printer Model Phaser 560 | 1 |
| HP Laserprinter, Model 4000 TN | 1 |
| Proxima Desktop Projector 9210 | 1 |

# EXHIBIT B

## Eliott Berman

From: dalbalah@mwe.com
Sent: Thursday, May 20, 2004 12:39 PM
To: mhays@dowlohnes.com
Cc: fsnitow@skhmlaw.com; mgoldstein@dowlohnes.com
Subject: Touro/IDT



B0050C5B.PDF

Michael,

As you know, this Firm represents IDT Corporation ("IDT") in respect to Touro College and Touro University California ("TUI").

You have advised us that Touro intends to conduct an auction. For the reasons discussed in the conference call yesterday with Mark Selinger, IDT is of the opinion that an auction would be absolutely contrary to the best interests of Touro, and a violation of the proper exercise of fiduciary duties.

We would very much like to sit down with you to discuss a process which is in all of our interests. Such a meeting could include Leeds, Weld & Co., a leader in the for-profit education industry. Unfortunately, our efforts to sit down to discuss this have been rebuffed. We again offer to meet as soon as possible.

UBS has suggested that the process will involve less than a hand-full of potential bidders. Our concern about process -- a concern we think you would share -- increased yesterday when we learned that a UBS banker made a cold call and left a voicemail disclosing TUI's cash flow -- without the benefit of a confidentiality agreement. This lack of discipline is troublesome, and could jeopardize our collective interests.

Please be advised that IDT's claim must be disclosed to any potential bidders, and in the event Touro fails to do so, IDT reserves to right to make such disclosures unilaterally.

You have asked us to provide you with some background and information supporting IDT's claim for 20% of the gross proceeds from the sale of TUI. We would encourage you to speak with Dr. Lander, who solicited IDT's investment in 1998, as well as others at TUI who worked closely with IDT in establishing TUI.

Based on its agreement with Touro, beginning in 1998, IDT provided substantial goods and services to Touro, which were essential to Touro in creating TUI. A list of some of the hardware that was bought by IDT (with the purpose of assisting Touro in creating TUI) and provided to Touro (including the quantity of each product supplied) is attached. IDT also provided a dedicated T-1 line for TUI.

In addition to equipment, IDT provided essential business and technical services relating to, among other thing, network security, network structure, network architecture, and the evaluation of streaming video platforms.

We would encourage you to speak with your client and to contact me to arrange a meeting among representatives of IDT, Leeds, Weld and Touro at the earliest possible date. We believe fiduciary duties require such a meeting.

1

Sincerely yours,

David C. Albalah
McDermott, Will & Emery
50 Rockefeller Plaza
New York, New York  10020-1605
(212) 547-5335
(212) 547-5444 fax


(See attached file: B0050C5B.PDF)


************************************************************************************
*******************************

This message is a PRIVATE communication. This message and all attachments
are a private communication sent by a law firm and may be confidential or
protected by privilege. If you are not the intended recipient, you are
hereby notified that any disclosure, copying, distribution or use of the
information contained in or attached to this message is strictly
prohibited.  Please notify the sender of the delivery error by replying to
this message, and then delete it from your system.  Thank you.
************************************************************************************
*******************************


For more information on McDERMOTT, WILL & EMERY please visit our website
at: http://www.mwe.com/

2

# EXHIBIT C



## DOW, LOHNES & ALBERTSON

MICHAEL B. GOLDSTEIN
DIRECT DIAL 202-776-2569
FACSIMILE 202-776-4569
mgoldstein@dowlohnes.com

ATTORNEYS AT LAW

WASHINGTON      ATLANTA

1200 NEW HAMPSHIRE AVENUE, N.W. • SUITE 800
WASHINGTON, D.C. 20036-6802
202-776-2000
www.dowlohnes.com

June 11, 2004

David C. Albalah, Esq.
McDermott, Will & Emery
50 Rockefeller Plaza
New York, New York 10020-1605

Re:  Touro University International

Dear Mr. Albalah:

As you know, we represent Touro College and Touro University (collectively, "Touro") in connection with a possible sale of the assets of the online program of Touro University. The online program does business as an operating division of Touro University known as Touro University International ("TUI").

We have reviewed your email correspondence of May 20, 2004, sent on behalf of your client IDT Corporation ("IDT") and its Chairman of the Board of Directors, Howard S. Jonas. In that correspondence, you assert a claim by IDT, based solely upon an alleged oral agreement between Dr. Bernard Lander, President of Touro, and Mr. Jonas, supposedly made in 1998, to twenty percent (20%) of the gross proceeds from any sale of the TUI assets.

As you requested in your May 20th email, we have conferred with our client regarding IDT's claim. As you and Mr. Jonas have been previously informed, Touro categorically denies the existence of any agreement. In conjunction with Touro general counsel Franklyn Snitow, we have conducted a full investigation, on behalf of Touro, into IDT's claim that there was a secret oral agreement to grant some interest in TUI to IDT, and we have concluded that the claim is without any factual basis.

The series of changes in the underlying story advanced by IDT's representatives belie the integrity of the claim. For example, in April your colleague Mark Selinger averred to Touro representatives that there were "ribbon copies" and execution versions of an alleged written agreement and other extensive email documentation involving Dr. Lander (who is legally blind and does not use emails) to substantiate the IDT theory. However, in late May IDT finally admitted that there is no writing to evidence the purported "agreement" that is at the basis of its claim, but only unsubstantiated conversations. Indeed, the chronology of events and the failure of either Mr. Jonas or IDT to make proper disclosure of this alleged interest are in direct contradiction of the theory being presently advanced.

DAVID C. ALBALAH, ESQ.
JUNE 11, 2004
PAGE 2

    Accordingly, Touro will not comply with your demand that it advise prospective purchasers of this claim. On the contrary, the actions taken by IDT, Mr. Jonas, and their representatives to assert this alleged claim of an ownership stake (which has changed over time from an asserted interest in the non-profit institution itself, to a share in the TUI assets, to a claim to a percentage of the TUI sale proceeds) have seriously compromised the status of the negotiations and proposed sale of the TUI assets and indeed have jeopardized the ability of Leeds Weld & Co. ("Leeds Weld") to participate in the auction. Any attempt by IDT or any of its principals, employees or agents to contact prospective purchasers regarding this claim, or to in any other manner to interfere with the orderly disposition of the TUI assets, is tortious and improper, and subjects IDT and any participating principal, employee or agent to a damages claim for interference, as well as such other remedies as may be appropriate under the circumstances.

    Finally, as we have recently reminded Mr. Selinger, all communications respecting this matter are to be directed solely to the undersigned or to Touro general counsel, Franklyn Snitow. We trust that Mr. Selinger's egregious breaches of professional ethics will not be repeated.

    Touro hereby reserves all rights and remedies with respect to this matter.

Very truly yours,

Michael B. Goldstein
Special Counsel

Cc:    Mark Hasten, Chair, Touro Boards
      Dr. Bernard Lander, President, Touro College and University
      Franklyn Snitow, Esq., General Counsel
      Michael D. Hays, Esq.
      Edward O'Connell, Esq.
      Mark Selinger, Esq.