NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| IDT CORPORATION, | : | |
| Plaintiff, | : | Civil Action No. 07-6080 (JAG) |
| | : | |
| ·v | : | **OPINION** |
| | : | |
| TOURO COLLEGE, and TOURO | : | |
| UNIVERSITY | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

**GREENAWAY, JR., U.S.D.J.**

This matter comes before the Court on the motion to dismiss Count I of Plaintiff's

Complaint for failure to state a claim upon which relief can be granted, pursuant to FED. R. CIV.

P. 12(b)(6), by Touro College, and Touro University (collectively "Defendants").  For the reasons

set forth below, this motion will be granted as to Count I of the Complaint.[1]

## I. BACKGROUND

Plaintiff IDT Corporation ("IDT" or "Plaintiff") filed suit seeking damages for breach of

contract and declaratory judgment.  IDT is a publicly traded company engaged in the

---

[1] Count II of Plaintiff's Complaint seeks declaratory relief against Summit Partners.  This
Court dismissed Summit Partners ("Summit") and Touro University International ("TUI") as
parties to this action, pursuant to Plaintiff IDT's voluntary dismissal on May 15, 2008.  Based on
this Court's dismissal of Count I, there can be no finding that IDT retains a 20% equity position
in TUI, regardless of Summit's purchase of TUI from Touro College.

telecommunications business.  (Compl. ¶ 1.)  Although it is a Delaware corporation, its principal place of business is in Newark, New Jersey. (Id.)  Plaintiff alleges that in mid-to-late 1998, IDT's founder, Howard Jonas, was approached by Dr. Bernard Lander, the founder of Touro College. (Id. at ¶ 14.)  Dr. Lander sought Mr. Jonas's advice in establishing an online, internet-based university. (Id.)  Dr. Lander informed Mr. Jonas that Touro College could both develop a curriculum for the online university and supply its faculty members; however, the only impediment frustrating further progress was that Dr. Lander did not possess the hardware, software, or technological infrastructure necessary to complete such a venture. (Id.)  Dr. Lander suggested that IDT provide the technological resources Touro College would need for the venture given IDT's success and know how in emerging technical fields and markets.  (Id. at ¶ 15.)

In exchange for a 20% equity interest in the online venture, Mr. Jonas offered IDT's services to help establish the online university.  (Id. at ¶ 16.)  Dr. Lander, on behalf of Touro College, accepted Mr. Jonas's verbal offer; as a result, IDT and Touro College entered into an oral contract according to these terms (the "Agreement"). (Id.)

In accordance with the Agreement, Touro College established the online school, TUI, which was registered and accredited in California and operated as a division of Touro University (a subsidiary of Touro College). (Id. at ¶¶ 7, 18, 20.)  IDT provided essential goods and services, including internet hosting and connectivity, a dedicated T-1 access line, computer hardware and equipment, and essential technical personnel which enabled TUI to function. (Id. at ¶ 19.)

Between April and September 1999, Touro College and IDT, through counsel, engaged in negotiations to modify the Agreement and memorialize IDT's role in the formation and establishment of TUI.  (Id. at ¶ 23.)  These contract talks were abandoned, leaving the

original oral agreement in place. (Id.)

On or about October 31, 2007, Touro College publicly announced a deal to sell substantially all of the assets of TUI to Summit Partners ("Summit") for approximately $190 million.  (Id. at ¶ 32.) IDT claims that it is entitled to 20% of the proceeds of the sale of TUI to Summit (approximately $38 million). (Id. at ¶ 33.)  Touro College has refused to pay IDT any portion of the proceeds of the sale of TUI to Summit. (Id. at ¶ 34.)

## II. JURISDICTION AND VENUE

This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1332.  The parties to this action are of diverse citizenship and the amount in controversy exceeds $75,000.  Venue is proper, pursuant to 28 U.S.C. § 1391.

## III. STANDARD OF REVIEW

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), while abrogating the decision in other respects).  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Twombly, 127 S. Ct. at 1964-65 (internal citations omitted); see also FED. R. CIV. P. 8(a)(2).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Id. at 1965 (internal citations omitted).  "The pleader is required

3

to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" Kost v. Kozakewicz, 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1357 at 340 (2d ed. 1990)).

A court must accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party. Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384-85 (3d Cir. 1994); see also Sturm v. Clark, 835 F.2d 1009, 1011 (3d Cir. 1987). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 n.8 (3d Cir. 1997). "The defendant bears the burden of showing that no claim has been presented." Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005).

A Rule 12(b)(6) motion to dismiss should be granted only if the plaintiff is unable to articulate "enough facts to state a claim to relief that is plausible on its face." Twombly, 127 S. Ct. at 1974; see also In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397 (3d Cir. 2000) (stating that a complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim).

In reviewing a motion to dismiss, pursuant to Rule 12(b)(6), a court may consider the

allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record.  Pittsburgh v. W. Penn Power Co., 147 F.3d 256, 259 (3d Cir. 1998); see also 5B Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure: Civil 3d § 1357 (3d ed. 2007).  "Plaintiffs cannot prevent a court from looking at the texts of the documents on which [their] claim is based by failing to attach or explicitly cite them."  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).  "[A] 'document *integral to or explicitly relied* upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'"  Id. (emphasis in original) (quoting Shaw v Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)).  Any further expansion beyond the pleading, however, may require conversion of the motion into one for summary judgment.  FED. R. CIV. P. 12(b).

**B.**    **Choice of Law**

A federal district court sitting in diversity must apply the choice of law principles of the forum state.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941).  The New Jersey Supreme Court has established these choice of law rules:

> [T]he determinative law is that of the state with the greatest interest in governing the particular issue.  The first step in the analysis is to determine whether a conflict exists between the law of the interested states.  Any such conflict is to be determined on an issue-by-issue basis.  If an actual conflict exists, the next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties.  If that state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply.  Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply.

Vezey v. Doremus, 510 A.2d 1187, 1189 (N.J. 1986).

Under New Jersey law, the governing law in a contract case is that of the jurisdiction with

the most significant relationship and closest contacts with the transaction and the parties.  State

Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 417 A.2d 488, 491 (N.J. 1980).  "The law of the

state that the parties understood was to be the principal location of the insured risk governs

unless some other state has a more significant relationship to the transaction and the parties."

Gilbert Spruance Co. v. Pa. Mfrs. Ass'n Ins. Co., 629 A.2d 885, 894. (N.J. 1993).

      C.    **Elements of a Breach of Contract Claim**

"Under New York law, a plaintiff asserting a claim for breach of contract must prove the

following elements: (1) the existence of a contract; (2) breach by the other party; and (3) damages

suffered as a result of the breach.  Americorp Financial, Inc. v. St. Joseph's Hospital Health

Center, 180 F. Supp. 2d 387, 390 (citing Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d

Cir. 2000))."  See Chaffee v. Farmers New Century Ins. Co., Slip Copy, 2008 WL 4426620

(N.D.N.Y 2008.)

## IV. ANALYSIS

      A.    **Defendant's 12(b)(6) Motion to Dismiss**

In addressing this motion to dismiss, this Court must, for each issue, perform a choice of

law analysis.  Klaxon, 313 U.S. at 496-97.  In this case, Plaintiff, a Delaware corporation, whose

principal place of business is in Newark, New Jersey, asserts a claim for breach of oral contract

against Touro College, a New York not-for-profit corporation, whose principal place of business

is in New York, New York.  (Compl. at ¶ 2.)  Accordingly, New Jersey and New York are the

states with the greatest interest in the governing law to be applied to the Agreement in this case.

This Court finds no basis to apply New Jersey not-for-profit corporation law to Touro College–a

New York not-for-profit corporation.  Also, the parties both acknowledge that New York is the

state with the greatest interest in governing the breach of contract claim against Touro College. As a result, this Court will apply New York law to the breach of contract claim between IDT and Touro College.

**B.**     **Breach of Contract Claim Against Touro College**

Plaintiff alleges that Touro College breached the Agreement when TUI was sold to Summit Partners, and Plaintiff did not receive 20% of the proceeds of the sale, consistent with the Agreement.  (Compl. at ¶ 33-34.)  New York Education Law §216(a)(4) provides that "...the not-for-profit law applies to a domestic education corporation", except where provided in that section.  Under the New York Not-For-Profit Corporation Law ("N-PCL"), a not-for-profit corporation is expressly prohibited from issuing shares, "a corporation shall not have stock or shares or certificates for stock or for shares..." McKinney's N-PCL § 501.

New York courts have applied § 501 to declare agreements null and void in cases involving not-for-profit corporations that issued shares.  See Spencer v. Petrone, 747 N.Y.S.2d 569, 570 (2d Dep't 2002), "A not-for-profit corporation, such as PLCA, is statutorily prohibited from issuing shares (*see* N-PCL 501; 502) (italics in original). Therefore, there were no shares for the plaintiff to acquire, and the purported sale has to be declared null and void."  In Spencer, the New York Appellate Division reversed a lower-court decision that declared a plaintiff the sole officer and director of a not-for-profit corporation after the Spencer plaintiff acquired had 50% of the shares issued by the not-for-profit corporation.  The Spencer court held an agreement, in which the plaintiff acquired an additional 25% of the not-for-profit corporation's shares by paying the previous owner of the shares $15,000–thus reaching the 50% ownership mark–to be null and void, and declared all members of the corporation to have equal voting rights.  Id.  See

also, Thakur v. 210 Forsyth Street Housing Development Fund Corp. 844 N.Y.S.2d 686 (N.Y.

Sup. Ct. 2007) ("Section 501 states that a corporation organized under the N-PCL "shall not have

stock or shares or certificates for stock or for shares," and § 602(f) states that no by-law may be

"inconsistent with this chapter."  Thus, in Spencer v. Petrone, 297 A.D.2d 730, 747 N.Y.S.2d

569 (2d Dep't 2002), where the not-for-profit corporation issued shares, the court held that since

the corporation was statutorily prohibited from issuing shares, "there were no shares for the

plaintiff to acquire, and the purported sale (of 50 shares to him) has to be declared null and void."

Consequently, notwithstanding the plaintiff's purported ownership of 50% of the corporation's

shares, he was held to have had the same one vote as any other member.")

        In the instant case, the Agreement, which provides that IDT receive a 20% equity interest

in TUI, a division of Touro College's subsidiary Touro University, is in violation of N-PCL §

501.  IDT cannot own 20% of the equity in TUI.  As Plaintiff alleges, TUI is not an independent

entity but rather a division of Touro University (which in turn is a subsidiary of Touro College).

Nowhere in the Complaint does Plaintiff claim that the $38 million it is owed from the sale of

TUI, represents fair market value for the goods and services it has provided to Touro College.

Indeed, Plaintiff's claim for $38 million resembles a claim for Plaintiff's share of a return on an

investment.  In essence, the deal appears to be–if IDT participates in assisting TUI, Touro will

allow Plaintiff an equity share in a future deal, i.e., the sale of TUI.  Substantively, such an

arrangement is perilously analogous to a sale of stock or shares, verboten by § 501.

        This Court finds that to permit IDT to claim 20% of the equity in TUI would be akin to

granting IDT an equity interest in Touro College and would violate the intent of N-PCL § 501,

which is to prevent private individuals from profiting from the ownership of shares in a not-for-

profit corporation.  See U.S. v. Mississippi Generating Co., 364 U.S. 520, 563 (1961)("...a statute frequently implies that a contract is not to be enforced when it arises out of circumstances that would lead enforcement to offend the central purposes of the enactment.")

Further, the Agreement, which would require Touro College to distribute profits to Plaintiff in proportion to its equity interest in TUI, violates N-PCL § 204.  Section 204 provides that, "notwithstanding any other provision of this chapter or any other general law, a corporation of any type or kind to which this chapter applies shall conduct no activities for pecuniary profit or financial gain, whether or not in furtherance of its corporate purposes, except to the extent that such activity supports its other lawful activities then being conducted." McKinney's N-PCL § 204. See also Santos v. Chappell, 318 N.Y.S.2d 570, 578 (N.Y. Sup. Ct. 1971) ("Income producing activities cannot go beyond what is reasonably related to the corporation's activities.") If Touro College was to distribute $38 million from a sale of TUI to IDT for its services, Touro College would in essence produce income for a corporation that bears no relationship to Touro College's function as an institutiion of higher education.  Id. at 578.

In addition, not-for-profit corporations, such as Touro College, that receive tax exempt status under section 501(c)(3) of the Internal Revenue Code cannot lawfully transfer equity, and may not allow their wealth to inure to the benefit of private individuals. See Orange Country Agr. Soc., Inc. v. C.I.R., 893 F.2d 529, 534 (2d Cir. 1990)("we find no error in Tax Court's findings that part of the Society's earnings inured to the benefit of private interests...in contravention of section 501(c)(3)".)

Based on the foregoing, Plaintiff's breach of contract claim against Touro College must fail.  The Agreement, if it were enforced would violate N-PCL §§ 501 and 204, and I.R.C. §

501(c)(3).  The Agreement, which purports to grant to Plaintiff a 20% equity interest in TUI, is, by its terms, unenforceable.[2]

Under New York law, a plaintiff asserting a claim for breach of contract must prove the following elements: "(1) the existence of a contract; (2) breach by the other party; and (3) damages suffered as a result of the breach."  See Terwilliger, 206 F.3d at 245-46.  This Court

---

[2] Plaintiff alleges no facts to support a finding that IDT entered into an agreement with Touro University, which according to Plaintiff's Complaint is a subsidiary of Touro College. (See generally, Compl.)  This Court has found the Agreement between Touro College and IDT to be void and unenforceable.  Accordingly, this Court finds that there is no valid agreement between IDT and Touro University.  Even if this Court were to apply California law to Plaintiff's proposed claim against Touro University, the Agreement is void and unenforceable.

Parenthetically, California Nonprofit Public Benefit Corporation Law ("CNPBL") § 5910, provides, "any mortgage deed of trust, pledge or other hypothecation of all or any part of the corporation's property, real or personal, for the purpose of securing the payment for performance of any contract or obligation may be approved by its Board." CNPBL § 5910.

According to Plaintiff, only Dr. Bernard Lander, the founder of Touro College, agreed to provide IDT with a 20 % equity interest in the online venture, TUI.   Plaintiff has not alleged that the Board of Trustees of Touro University took any action to effectuate the terms of the Agreement, as required by California law.  Pursuant to CNPBL § 5210, every California nonprofit organization must have a board of trustees, and a corporation's activities, affairs and corporate powers must be exercised by or under direction of its Board.  See CNPBL § 5210, which provides that "...the activities and affairs of a corporation shall be conducted and all corporate powers shall be exercised by or under the direction of the Board."

The Agreement, which purports to bind the corporation without Board approval is in violation of California law and is therefore unenforceable.   In addition, Touro University is organized exclusively for educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code ("I.R.C.")  Corporations, such as Touro University, that receive tax exempt status under I.R.C. § 501(c)(3) cannot lawfully transfer equity, and may not allow their wealth to inure to the benefit of private individuals.  Section 501(c)(3) confers tax exempt status to "corporations...no part of the net earnings of which inures to the benefit of any private shareholder or individual." I.R.C.  § 501(c)(3).  See also Redlands Surgical Services v. Commissioner of Internal Revenue, 242 F.3d 904 (9th Cir. 2001), which upheld a Tax Court's decision that found that a hospital had conferred impermissible benefits to private parties and was therefore not operating "exclusively for exempt purposes within the meaning 50l(c)(3), I.R.C."

Here, the Agreement, which purports to grant to Plaintiff a 20% equity interest in TUI (a division of Touro University), is, by its very terms, unenforceable.

finds the Agreement, between IDT and Touro College to be unenforceable.  Accordingly,

Plaintiff fails to demonstrate the existence of a contract, which is a necessary element of a breach

of contract claim under New York law.  See Computer Associates Intern., Inc. v. U.S. Balloon

Mfg. Co., Inc., 782 N.Y.S.2d 117 (2d Dep't 2004) (affirming lower court's decision to dismiss

breach of contract claim when contract was found to be unenforceable).

## V. CONCLUSION

For the reasons set forth above, this Court grants Defendants' motion to dismiss Count I

of Plaintiff's Complaint for failure to state a claim upon which relief can be granted, pursuant to

Fed. R. Civ. P.12(b)(6).


 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Date:   December 16, 2008